This Opinion is a
Precedent of the TTAB

Hearing: September 26, 2024                    Mailed: January 2, 2025

UNITED STATES PATENT AND TRADEMARK OFFICE
____

Trademark Trial and Appeal Board
____

*In re Audemars Piguet Holding SA*
____

Serial Nos. 90045780 & 90045814
____

Milton Springut and Caroline G. Boehm of Moses & Singer LLP,
    for Audemars Piguet Holding SA.

Taryn Smith, Trademark Examining Attorney, Law Office 104,
    Zachary Cromer, Managing Attorney.

____

Before Wellington, Dunn, and Casagrande,
    Administrative Trademark Judges.

Opinion by Casagrande, Administrative Trademark Judge:

Audemars Piguet Holding SA ("Applicant") filed two applications to register, as

trademarks on the Principal Register, the "three-dimensional configuration design[s]

of a watch" as shown in the following drawings:

| Ser. No. 90045780 (the '780 Application) | Ser. No. 90045814 (the '814 Application) |
|:---:|:---:|
|  | |

Applicant describes the mark in the '780 Application as follows (bracketed numbers added for ease of reference):

> The mark consists of a three-dimensional configuration design of a watch: [1] the watch face is round and [2] surrounded by an octagonal-shaped unitary bezel [3] which features eight hexagonal-shaped screw heads positioned parallel to the curve of the bezel at each corner of the octagon; [4] the watch case is a unitary piece below the bezel and extending beyond the four corner sides (i.e., NE, SE, SW, and NW) of the bezel; [5] at the north and south ends of the bezel, the width of the case narrows slightly and slopes downwardly at both ends, giving the appearance of a plate extending across the width of the case and [6] including two indentations on each end into which are inserted attachment studs which connect the case to a bracelet; [7] the attachment studs are rectangular with rounded ends; [8] the bracelet consists of connecting links which are trapezoid-shaped, having parallel sides on top and bottom and sloping sides that narrow the width of the bracelet as one moves away from the watch case; [9] the links have a pair of indentations on each parallel side into which are inserted [10] small connecting studs which match the shape of the attachment studs and such indentations are aligned and arranged that all the small connecting studs together with the attachment studs form two lines of rectangular shaped plates; [11] the watch face is adorned with a Grande Tapisserie decorative pattern constituted by regularly spaced raised points covering the entire face; [12] the winding crown is a faceted hexagon.

> The dotted outline of the watch hands and the date window are not part of the mark but are merely intended to indicate the position of the mark. Color is not claimed as a feature of the mark.

The description in the '814 Application is identical except that it omits elements [8]-[10] because the drawing does not include a bracelet or watchband, which the '814 Application drawing depicts in dotted lines.[1]

The applications were assigned to the same Trademark Examining Attorney and prosecution of the applications proceeded largely in parallel. Because there is a dispute in this appeal relating to the course of prosecution, we briefly recount how examination of the applications proceeded.

In the first Office Action, the applications were refused for three reasons. First, because both applications are for product designs, the Examining Attorney refused registration due to lack of distinctiveness, because product design is inherently nondistinctive and neither application claimed acquired distinctiveness.[2] Second, the Examining Attorney found the drawings deficient because they failed to portray several functional elements in dotted or broken lines, namely: the circular watch face, the watch case, the crown, the attachment studs, the linked bracelet (only in the '780

---

[1] Both applications were filed on July 10, 2020, under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a) and identify "watches; wristwatches" in International Class 14. As to the '780 Application, Applicant claimed first use anywhere and in commerce since at least as early as May 22, 1972. As to the '814 Application, Applicant claimed first use anywhere and in commerce since at least as early as December 31, 1993.

[2] *See, e.g.*, October 29, 2020, Nonfinal Office Action, at TSDR 2 ('780 Application). Citations in this opinion to the application records refer to the versions of those records downloaded in .pdf format from the USPTO's Trademark Status and Document Retrieval ("TSDR") database. Where we refer to aspects of prosecution that were the same in each file, we generally will use the introductory signal "*See, e.g.*," and parenthetically refer to the application to which the document pertains.

Application), and the grooves in the screwheads.[3] Third, the Examining Attorney found the specimens unacceptable because they appeared to be digitally-created or digitally-altered images of the products.[4]

After Applicant responded to the Office Actions and presented its evidence of acquired distinctiveness, the Examining Attorney issued Final Office Actions that withdrew the refusals based on lack of distinctiveness but maintained the functionality-based drawing requirements and the requirements for substitute specimens.[5]

Applicant requested reconsideration[6] and appealed to the Board.[7] The Board suspended the appeals to permit the Examining Attorney to rule on the requests for reconsideration.[8] While the appeals were suspended, the Examining Attorney asked the Board for remands in both cases, explaining that:

> a refusal for non-distinctive product design was inadvertently omitted from the final office action. On remand, the trademark examining attorney intends to raise the omitted issue and provide additional evidence regarding the distinctiveness of applicant's product design.[9]

---

[3]  *See, e.g.*, *id.* at TSDR 2-3.

[4]  *See, e.g.*, *id.* at 3-4.

[5]  *See, e.g.*, November 23, 2021, Final Office Action, at TSDR 2-5 ('780 Application).

[6]  *See, e.g.*, April 27, 2022, Request for Reconsideration ('780 Application).

[7]  *See, e.g.*, 1 TTABVUE ('780 Application). References to the briefs and appeal record cite to the Board's TTABVUE electronic docket system. The number preceding "TTABVUE" represents the docket number assigned to the cited filing in TTABVUE and any number immediately following "TTABVUE" identifies the specifically-cited page(s), if any.

[8]  *See, e.g.*, 2 TTABVUE ('780 Application).

[9]  *See, e.g.*, 4 TTABVUE ('780 Application).

The Board granted the Examining Attorney's request and remanded for further examination.[10]

After further examination, the Examining Attorney issued Nonfinal Office Actions that maintained the functionality-based drawing requirements as to all elements except the octagonal bezel with hexagonal screw heads and the waffle-like pattern of the covering of the watch face (i.e., features [2], [3] & [11] in the Applicant's descriptions of the designs, *supra*) and the requirements for substitute specimens, and added a drawing requirement based on the failure of Applicant's evidence to demonstrate acquired distinctiveness as to the entire design, noting that the evidence showed acquired distinctiveness only as to features [2] & [3].[11] After Applicant responded, the Examining Attorney ultimately issued Subsequent Final Office Actions in both cases, refusing registration based on the functionality-based and distinctiveness-based drawing requirements.[12]

The Board then resumed the appeals.[13] Applicant filed briefs,[14] as did the Examining Attorney.[15] Applicant filed reply briefs[16] and requested in-person oral

---

[10]   *See* 5 TTABVUE ('780 Application).

[11]   *See, e.g.*, March 9, 2023, Nonfinal Office Action, at TSDR 4-11 ('780 Application).

[12]   *See* January 9, 2024, Subsequent Final Office Action, at TSDR 3-6 ('780 Application). The Examining Attorney was satisfied with Applicant's explanations and evidence regarding the specimens and withdrew the specimen refusals from the Subsequent Final Refusal. *See, e.g., id.* at 3.

[13]   *See, e.g.*, 9 TTABVUE ('780 Application).

[14]   *See* 13 TTABVUE (both cases).

[15]   *See* 15 TTABVUE (both cases).

[16]   *See* 16 TTABVUE (both cases).

argument,[17] which occurred in both cases on September 26, 2024.[18] The cases are now ready for decision. For the reasons explained below, we affirm the refusals to register.

Before addressing the merits, we note that the issues raised by the two appeals are nearly identical, save for a few additional features pertaining to the bracelet portion of the design in the '780 Application that are not present in the design of the '814 Application. The briefs also are nearly identical, as are the evidentiary records. Accordingly, although the appeals have not been formally consolidated, we address both in a single opinion. *See, e.g.*, *In re Consumer Protection Firm*, Ser. No. 87445801, 2021 WL 825503, at \*1-2 (TTAB 2021)[19] ("[E]ach proceeding retains its separate character and will result in the entry of a separate judgment for each appealed application; a copy of this decision shall be placed in each proceeding file."); *see also* TBMP § 1214.

Our assessment of the two drawing requirements will begin by analyzing the refusals as they pertain to the non-bracelet portions of the watch designs, which are identical. If necessary, we will then proceed to assess the bracelet portions of the design in the '780 Application.

---

[17]  *See* 17 TTABVUE ('780 Application); 18 TTABVUE ('814 Application).

[18]  *See* 23 TTABVUE ('780 Application); 22 TTABVUE ('814 Application).

[19]  This opinion is issued as part of an internal Board pilot citation program on broadening acceptable forms of legal citation in Board cases. Westlaw (WL) citations are used for decisions of the Board, and only precedential Board decisions are cited. Decisions of the U.S. Court of Appeals for the Federal Circuit and its predecessor, the U.S. Court of Customs and Patent Appeals, are cited only to the Federal Reporter (e.g., F.2d, F.3d, or F.4th). This opinion thus conforms to the practice set forth in TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE ("TBMP") § 101.03 (2024).

## I. Analysis

Before we get to the two drawing requirements, we must grapple with three threshold arguments raised by Applicant.

### A. The propriety of the post-remand Subsequent Final Office Actions

After the Board granted the Examining Attorney's request for a remand for additional examination concerning an inadvertently omitted refusal concerning the distinctiveness of the watch designs, the Examining Attorney's Subsequent Final Office Actions contained two refusals: a drawing requirement based on functionality of certain elements; and a lack-of-distinctiveness drawing requirement as to the same design elements. Applicant says this was improper, arguing that, after the remand, the Examining Attorney was permitted to refuse only based on the lack-of-distinctiveness drawing requirement.[20]

We reject this argument. The Examining Attorney's remand request asked for an opportunity to address an "inadvertently omitted" refusal, not a substitute refusal for the already issued functionality-based drawing requirement refusal. The request did not indicate that the Examining Attorney intended to withdraw the functionality-based drawing refusal. Therefore, it was entirely proper that the Subsequent Final Office Actions contained both the inadvertently-omitted lack-of-distinctiveness drawing requirement and the original functionality drawing requirement. If the Subsequent Final Office Actions had not contained both drawing requirements, then

---

[20]  *See* 13 TTABVUE 5-7 ('780 Application); 13 TTABVUE 6-7 ('814 Application).

that would have resulted in ambiguity as to whether the functionality drawing requirement had been withdrawn.

Applicant also argues that the additional evidence submitted by the Examining Attorney during remand should be stricken as beyond the scope of the requested remand, citing *In re Hughes Furniture Industries, Inc.*, Ser. No. 85627379, 2015 WL 1734918 (TTAB 2015).[21] In *Hughes*, the applicant asked for a remand for the sole purpose of entering a required disclaimer, which would have the effect of narrowing the Section 2(d) issue on appeal. *Id.* at *1. On remand, however, the examining attorney "mistakenly treated Applicant's request for remand as a request for reconsideration," and took the opportunity to bolster the Section 2(d) refusal with additional evidence. *Id.* Here, in contrast, the Examining Attorney requested the remand to enter, and adduce additional evidence concerning, a second refusal based on lack of distinctiveness that had been inadvertently omitted. The evidence adduced on remand is unquestionably relevant to the lack of distinctiveness refusal, and Applicant does not contend otherwise.

We note further that Applicant provides no legal support for constricting consideration of record evidence that may support more than one refusal. *See, e.g.*, *In re Honeywell, Inc.*, 532 F.2d 180, 182 (CCPA 1976) (evidence that a design feature is common in the industry is highly pertinent to the existing functionality refusal). Here, the post-remand Nonfinal Office Action specifically maintained the

---

[21]   *See* 13 TTABVUE 6 ('780 Application); 13 TTABVUE 6 ('814 Application).

functionality-based drawing requirement.[22] On remand, Applicant had an opportunity to, and did, respond to the Nonfinal Office Action.[23] And the Subsequent Final Office Action not only maintained and made final the functionality-based drawing requirement,[24] but also informed Applicant that it could request reconsideration,[25] which it did not do. *See In re Pierce Foods Corp.*, Ser. No. 73353662, 1986 WL 83587, at *1 n.1 (TTAB 1986) (Board allowed evidence adduced by examiner on remand directed to a potential new ground, a drawing requirement, also to be considered as to the existing likelihood of confusion refusal where applicant had opportunity during the remand to submit argument and/or additional evidence).

For these reasons, we overrule Applicant's objections concerning the remand and consideration of evidence submitted during remand.

### B. Stare decisis does not require us to follow a 10-year old district court infringement decision assessing design elements not at issue here

Applicant also tries to short-circuit our review of the two drawing requirements by insisting that, under the doctrine of "stare decisis," we should follow a 2014 district court infringement decision in which Applicant won a judgment finding that the trade dress it asserted in that case was valid.[26] *See Audemars Piguet Holding S.A., v. Swiss Watch Int'l, Inc.*, 46 F. Supp. 3d 255 (S.D.N.Y. 2014). In the 2014 decision, the district

---

[22]  *See* March 9, 2023, Nonfinal Office Action at TSDR 4, 5-8.

[23]  *See* Sept. 8, 2023, Response.

[24]  *See* Jan. 9, 2024, Subsequent Final Office Action, at TSDR 4, 5-7.

[25]  *See id.* at 7-8.

[26]  *See* 13 TTABVUE 4-5, 8 ('780 Application); 13 TTABVUE 5, 8-9 ('814 Application).

court mentioned, but didn't actually analyze, two now-cancelled registrations that correspond to the two applications here.[27] Rather, its analysis of functionality and acquired distinctiveness focused only on the octagonal bezel with eight screw heads. *See* 46 F. Supp. 3d at 270 (describing the "Royal Oak Line" as "bearing a design of an octagonal shaped bezel with eight hexagonal screw-heads"); *id.* at 274 (likelihood of confusion analysis keyed on defendant's use of an "octagonal bezel with eight flat head screws spaced out around the bezel"); *id.* at 279 (trade dresses similar because "both watches have an octagonal bezel with eight flat screws spaced out around the bezel"); *id.* at 282 (rejecting functionality argument because "the trade dress at issue composed of an octagonal bezel with eight flat embedded screws is neither essential to the use or purpose of a watch nor does it affect the cost or quality of the article"). In the present appeals, however, those two elements are not at issue because they are exempted from the two drawing requirements.

"The doctrine of *stare decisis* may be defined as the policy of courts to stand by precedent and not to disturb a settled point." *Citigroup Inc. v. Capital City Bank Group, Inc.*, Opp. No. 91177415, 2010 WL 595586, at *24 (TTAB 2010), citing Black's Law Dictionary (8th ed. 2004), *aff'd,* 637 F.3d 1344 (Fed. Cir. 2011).[28] Here, the two

---

[27] Reg. Nos. 4,232,239 (corresponding to the '780 Application) and 4,232,240 (corresponding to the '814 Application). Both those registrations were cancelled in 2019 because Applicant did not file the required declaration under Section 8 of the Trademark Act, 15 U.S.C. § 1058.

[28] Applicant frames the legal standard as follows: "The rule of stare decisis requires that a prior finding that a mark is valid compels a finding of validity in the second action in the absence of a showing that the prior holding was manifestly erroneous." For this proposition, Applicant quotes "6 *McCarthy on Trademarks*, § 32:93 (2022)." The current 2024 version of that section, entitled "Issue preclusion—Court to court—Foreign court"—contains no such

elements of the watch configuration found valid by the district court are not subject to the drawing requirements underlying the instant refusals, and for that reason alone there is no prospect that our determination here will disturb the district court's finding of validity as to those two elements. Further, the Court of Appeals for the Federal Circuit has held that *stare decisis* does not apply to issues of fact. *See Deckers Corp. v. United States*, 752 F.3d 949, 956 (Fed. Cir. 2014). The issues of acquired distinctiveness and functionality are issues of fact, not of law. *See, e.g.*, *In re La. Fish Fry Prods., Ltd.*, 797 F.3d 1332, 1335 (Fed. Cir. 2015) (acquired distinctiveness); *In re Becton, Dickinson and Co.*, 675 F.3d 1368, 1372 (Fed. Cir. 2012) (functionality).

We therefore reject Applicant's stare decisis argument.

### C. Whether a nonprecedential Board decision allowing registration of another company's different watch designs bears on these appeals

Applicant also points to our nonprecedential decision in *In re Cartier N.V.*, Ser. No. 77227767, 2010 WL 3164745 (TTAB 2010), which reversed a refusal to register a watch design different from those at issue here and found that the design in that case had acquired distinctiveness. Applicant argues that the *Cartier* case presents facts that are "not very different" from the facts in the two cases before us.[29] Applicant urges us to give "weight" to that decision. As a general matter, it has been settled for decades that the USPTO "is required to examine all trademark applications for compliance with each and every eligibility requirement," *In re Cordua Rests., Inc.*,

---

quote. Nor does it mention "stare decisis" at all. The MCCARTHY treatise does not support Applicant's argument.

[29] *See* 13 TTABVUE 7 ('780 Application); 13 TTABVUE 7-8 ('814 Application).

823 F.3d 594, 600 (Fed. Cir. 2016) irrespective of whether, mistakenly or otherwise, it has registered other trademarks "which [an applicant] considers comparable to its own and under circumstances which [an applicant] feels are comparable to those here," *In re Radio Corp. of Am.*, 205 F.2d 180, 183 (CCPA 1953); *accord In re Nett Designs, Inc.*, 236 F.3d 1339, 1342 (Fed. Cir. 2001).

Even if we were to ignore this settled rule and the obvious differences in the watch designs, we see at least one key evidentiary difference between that case and these. Applicant highlights that, in *Cartier*, the applicant had two existing registrations for watch designs that were similar to the involved watch designs, and that the Board found it significant that these two registrations had "so recently survived the opposition process."[30] Here, however, Applicant's two cancelled registrations issued in 2012, and so have not recently survived an opposition process.[31]

We therefore decline to "weigh" the 2010 nonprecedential decision in *Cartier* as supporting Applicant's arguments here.

### D. The drawing requirements

Before we assess the two substantive refusals, it is important to understand their precise nature. Neither refusal is based on lack of acquired distinctiveness of the

---

[30] *See* 13 TTABVUE 7 ('780 Application); 13 TTABVUE 7 ('814 Application) (both quoting *Cartier*, 2010 WL 3164745, at *3).

[31] The Board's highlighting of the closeness in time of the oppositions is consistent with our primary reviewing court's emphasis on the relative importance of evidence of acquired distinctiveness from the five years preceding the determination at issue as compared to older evidence. *See, e.g.*, *Converse, Inc. v. ITC*, 909 F.3d 1110, 1121 (Fed. Cir. 2018). The only issue in *Cartier* was acquired distinctiveness, whereas, in these cases, there also is a drawing requirement based on functionality.

entire designs or on the functionality of the entire designs. Rather, both refusals are based on the inadequacy of the drawings provided by Applicant, and Applicant's refusal to comply with requirements issued by the Examining Attorney to revise the drawings. The Examining Attorney deemed the drawings, in their current form, unacceptable because they depicted several, but not all, elements of the watch designs in solid lines, meaning that they are features of the marks for which Applicant seeks registration, when they should instead be depicted in dotted or broken lines because they lack trademark significance.

There are two separate drawing requirements. Specifically, the Examining Attorney determined that Applicant's evidence proved acquired distinctiveness only as to two of the elements in the original drawings, namely, the octagonal bezel and the eight (8) hexagonal screwheads within the bezel. The Examining Attorney determined that the other elements are incapable of functioning as a mark, finding that they are nondistinctive and would not be viewed as indicating source.[32] As to the drawing requirements based on functionality, the Examining Attorney determined that all of the elements except the octagonal bezel with the eight hexagonal screwheads comprise functional matter. Thus, while the drawing requirements are based on separate legal issues, they both require the same revisions to the drawings: dotting out everything except the octagonal bezel and the eight hexagonal screwheads within the bezel. This, Applicant refused to do, instead opting to appeal to contest the refusals.

---

[32]    *See* Jan. 9, 2024, Subsequent Final Office Action, at TSDR 3-4.

### 1. Drawing requirements generally

It is also helpful to understand the underlying legal bases for drawing requirements, especially since Applicant advances a threshold argument that a drawing requirement to depict less than the entirety of a design in dotted lines lacks any legal basis.

Section 1(a)(2) of the Trademark Act, 15 U.S.C. § 1051(a)(2), provides that an application to register a trademark "shall include … a drawing of the mark." Trademark Rule 2.51(a), 37 C.F.R. § 2.51(a), provides that "the drawing of the mark must be a substantially exact representation of the mark as used …." Rule 2.52(b)(4), 37 C.F.R. § 2.52(b)(4), applies to applications "to register a mark that includes a two or three-dimensional design …." It provides:

> (4) Broken lines to show placement. If necessary to adequately depict the commercial impression of the mark, the applicant may be required to submit a drawing that shows the placement of the mark by surrounding the mark with a proportionately accurate broken-line representation of the particular goods, packaging, or advertising on which the mark appears. The applicant must also use broken lines to show any other **matter** not claimed as part of the mark. … (emphasis added).

Though Rule 2.52(b)(4) speaks in terms of matter "not claimed" as part of the mark, the CCPA's decision in *In re Water Gremlin Co.*, 635 F.2d 841 (CCPA 1980), makes clear that this rule applies where an examining attorney determines that matter included in a drawing cannot be claimed as part of the mark. *Water Gremlin* concerned a drawing requirement that the applicant depict functional aspects of a proposed trademark in broken or dotted lines. There, the mark consisted of a

combination of a design of a compartmented container with a handle with the words

SINKER SELECTOR depicted upon a transparent lid:



The USPTO found the non-literal elements of the container—the handle, the circular

shape, the wedge-shaped compartments, and the lid—were functional, and thus

"required the representation of the container either to be deleted from the drawing or

shown in dotted lines." *Id.* at 843. The Court affirmed the drawing requirement. It

agreed that:

> appellant's container is an unregistrable feature of the
> claimed mark. The examiner's requirement to delete the
> design (or show it in dotted lines) was entirely in order.
> Appellant's argument that this ground for rejection is
> inadequate inasmuch as the design is claimed with the
> words SINKER SELECTOR is not tenable. An application
> which includes a claim to rights in unregistrable subject
> matter must be rejected.

*Id.* at 844.

Applicant argues that a drawing requirement to depict less than the entirety of a

design in dotted lines is legally unsupportable. We disagree.[33] Rule 2.52(b)(4)

provides for use of dotted or broken lines in a drawing to depict any "**matter** not

---

[33] *See* 13 TTABVUE 19-21 ('780 Application); 13 TTABVUE 19-21 ('814 Application).

claimed **as part of the mark**." And the *Water Gremlin* Court affirmed the USPTO's application of that requirement to the container portion—which comprised functional elements—of the proposed mark in that case.[34] In so doing, the Court characterized the container as an "unregistrable **feature** of the claimed mark" and held that "[a]n application which **includes** a claim to rights in **unregistrable subject matter** must be rejected." 635 F.2d at 844 (emphasis added). Indeed, the Court specifically rejected the appellant's argument that the drawing requirement was erroneous because the container was combined with the words SINKER SELECTOR. *See id.* Section 2(e)(5) of the Trademark Act, 15 U.S.C. § 1052(e)(5), makes clear that an applicant may not obtain a registration for a proposed trademark that (5) **comprises any matter** that, as a whole, is functional (emphasis added)."[35] Thus, as exemplified in *Water Gremlin*, Rule 2.52(b)(4) and Section 2(e)(5) of the Act provide the basis for the requirement of dotted lines to signify unregistrable functional features in proposed marks.

Applicant argues that, in Section 2(e)(5), the phrase "as a whole" means that no drawing requirement may be issued for less than the entirety of a proposed product design mark.[36] This argument appears to require reading Section 2(e)(5) such that "as a whole" modifies "mark." We disagree with this argument as well.

Section 2(e) provides, in pertinent part:

---

[34] That would have required the dotting out of the whole container, except for the term SINKER SELECTOR, which was depicted in a definite position on the lid of the container.

[35] "Comprises" means to include or contain. *See* Dictionary.com (https://www.dictionary.com/browse/comprise) (last checked Oct. 30, 2024). Section 2(e)(5) thus provides that a mark that includes functional elements cannot be registered.

[36] *See, e.g.*, 13 TTABVUE 18 ('780 Application).

> No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it— … (e) Consists of a mark which … (5) comprises any matter that, as a whole, is functional.

"[A]s a whole" plainly modifies "any matter." Thus, when a mark, as depicted by the drawing, includes an element (i.e., "comprises matter") that, as a whole, is functional, the drawing does not depict a registrable mark because the functional element cannot be claimed as part of the mark. The entire mark as depicted in the drawing is not registrable, unless the drawing is amended to exclude the functional elements (by depicting them in dotted lines).[37]

We therefore reject Applicant's argument that there is no legal basis to require a revised drawing depicting fewer than all elements of a product design in dotted lines if they are found to comprise unregistrable subject matter.

## 2. The functionality-based drawing requirement

In these cases, the Trademark Examining Attorney determined that the designs comprise matter that is functional. Specifically, the Examining Attorney determined that all of the elements except the octagonal bezel with the eight hexagonal screwheads and the pattern covering the back of the watch face are functional and

---

[37] In the context of word marks, the disclaimer of terms unregistrable on their own facilitates registration of a mark of which those terms are a part by ensuring that the public is aware that the claim of right does not extend to the unregistrable term(s) alone. *See* 15 U.S.C. § 1056(a). Where the proposed mark is a product design, a drawing requirement that the functional element or elements be depicted in broken or dotted lines performs the same salutary function: it facilitates registration of the registrable aspects of the design while ensuring that the public is aware that the claim of right does not extend to the unregistrable element(s).

required them to be depicted in dotted or broken lines. Applicant refused to submit revised drawings.

"In general terms, a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n.10 (1982), quoted in *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 33 (2001) and *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (1995). To determine whether a product design is essential to the use or purpose of the article or if it affects the cost or quality of the article, the USPTO frequently looks at the kinds of evidence identified in *In re Morton-Norwich Prods., Inc.*, 671 F.2d 1332 (CCPA 1982). This includes patents and advertising discussing the functionality of the feature(s) at issue, the degree to which alternatives exist, and whether the design results from a relatively cheap or easy means of manufacture. *See Morton-Norwich*, 671 F.2d at 1340-41.

But *Morton-Norwich* does not limit the kinds of evidence that might be relevant to functionality. *See, e.g.*, *In re OEP Enters., Inc.*, Ser. No. 87345596, 2019 WL 3941266, at *5 (TTAB 2019) (stating that *Morton-Norwich* "identifies four nonexclusive categories of evidence which may be helpful in determining whether a particular design is functional"); *In re Change Wind Corp.*, Ser. No. 86046590, 2017 WL 3446786, at *2 (TTAB 2017) (same). Indeed, the CCPA's decision in *Honeywell*, 532 F.2d 180, identifies another type of evidence that, by itself, demonstrated the functionality of the product design in that case. In *Honeywell*, the Court held that the functionality of a round-shaped thermostat control was "demonstrated by the

widespread use over the years of round-shaped control devices for appliances and similar equipment." 532 F.2d at 182; *see also Becton, Dickinson*, 675 F.3d at 1376 (evidence that competitors sold products with a similar ribbed-cap component "underscores the competitive need" to be able to use the functional features claimed in the application); *Mine Safety Appliances Co. v. Elec. Storage Battery Co.*, 405 F.2d 901, 904 (CCPA 1969) (Board's finding of functionality supported in part by evidence that competitors sold competing products "with similar if not identical … designs"). As Judge Posner observed, "[f]unctional features are by definition those likely to be shared by different producers of the same product … ." *Publ'ns Int'l, Ltd. v. Landoll, Inc.*, 164 F.3d 337, 340 (7th Cir. 1998).

In this case, the Examining Attorney argues that the elements subject to the drawing requirement are functional due to common use in the watch industry.[38] We start with the circular watch face (design element [1] in the descriptions of the marks, *supra*). The record contains the following:

- An article in gearpatrol.com entitled "A Guide to Watch Case Shapes and Designs stating: "The vast majority of wristwatches out there use a type of watch case which we'll simply refer to as 'round' – no fancy names or interesting stories here. Round cases just make sense when a circular display is the clearest way to show and read time, and as such you'll see everything from dress watches to divers to field watches to chronographs in them. Round cases generally exude a sense of minimalism, indicating that there was no unnecessary material used";[39]

---

[38]   *See, e.g.*, 15 TTABVUE 5-10.

[39]   March 9, 2023, Nonfinal Office Action, at TSDR 346. Some of the articles listed here use "watch face" and others, like this article, refer to "watch case" in a broad way that encompasses the enclosure surrounding the "watch face," but these articles all discuss watches with a circular/round face, whether they're discussing it as part of the case or separately.

- o A later passage in the same article indicates that while "[s]quare watches have made a small but notable resurgence … to pay homage to the past," nevertheless "the round case remains supreme";[40]

- An article in worldofwatches.com entitled "Face Off: Round v. Square?" that states: "Round-faced watches are, of course, the most common. A round watch face is classic and is the traditional shape adopted by most watch manufacturers when designing a watch. A circle, after all, is a symbol of time itself …. The circular dial is so versatile it can work well with many different style (sic) of watch …";[41]

  - o A later passage in this article goes on to state: "It was, therefore, not surprising that in a recent Facebook poll conducted by World of Watches, in which they asked their brand name watch shoppers which they preferred: round or square, the majority of consumers said 'round' is their go-to choice for a watch face";[42]

- An explanatory article on watchmaster.com entitled "Watch parts in focus: Watch case" that states "The round watch case is probably considered the most typical design of a watch";[43]

- An article in timeaftertimewatches.com entitled "How Well Do You Know Your Watch Shapes?" states "Let's start with the most common" as a lead-in to its discussion of round watch cases: "Round watch cases are by far the most popular and common. They feature the typical circular shape and are produced by a large number of brands due to their popularity. These watches can be for

---

[40] *Id.* at 348.

[41] *Id.* at 356-57. Nothing in the Declaration of Xavier Nolot, attached to Apr. 27, 2022, Request for Reconsideration, indicates that the circular watch face's functionality is nullified by the fact that it was combined with any of the other design elements chosen to make up the watches in question. To the contrary, the Nolot Declaration is consistent with the observation in the "Face Off" article that a circular watch face is "versatile" because it works well with so many styles of watches, noting that Applicant chose this shape for use with Applicant's depicted watches because it "harmoniously work[s] with an octagonal bezel …." *See* April 27, 2022, Request for Reconsideration, at TSDR 7 ('780 Application). *See Brunswick Corp. v. British Seagull Ltd.*, 35 F.3d 1527, 1529-31 (Fed. Cir. 1994) (affirming Board's finding that the color black was functional for outboard boat engines because, *inter alia*, it was "compatible" with a wide variety of boat colors, thus showing a "competitive need" to be able to use that feature).

[42] March 9, 2023, Nonfinal Office Action, at TSDR 357.

[43] Nov. 23, 2021, Final Office Action, at TSDR 49.

everyday use but also come in more elegant designs. Most brands feature this type of watch";[44]

- An article in mouvexwatch.com, a watch retailer's website, states: "When you think about the shape of a watches' (sic) case what is the first thing that comes in your mind? Let us have a guess ... round shape, isn't it right? [I]t it is no wonder that most brands keep sticking to the round shape";[45]

- An article on watchgecko.com entitled "The Ultimate Guide to Watch Case Shapes" that states "Sure, the circular watch case is the most traditional" and goes on to say "We'll start with the obvious and most classic watch case shape: round. There's probably not much explaining to do here. These are watches with a classic circular display and are the most common case shape around. You'll find them in pretty much every watch brand's portfolio …";[46] and

- An article in thewatchindex.com entitled "Watches 101: The 10 Most Popular Watch Case Shapes" that list round cases first in its listing and states: "Round cases are the most popular (and therefore the most common) case shape."[47]

The dominance of the circular or round watch face is exemplified by the hundreds of depictions of third-party watches in the record that feature the near-ubiquitous round watch face.[48] We find that this evidence shows widespread use of round watch faces, indicating that it is the most utilitarian shape of all and is needed to compete effectively in the watch market. *See, e.g.*, *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 775 (1992) (a design is functional if it reflects "one of a limited number of equally efficient options available to competitors and free competition would be

---

[44]   March 9, 2023, Nonfinal Office Action, at TSDR 350.

[45]   *Id.* at 359.

[46]   Jan. 9, 2024, Subsequent Final Office Action, at TSDR 130.

[47]   *Id.* at 253.

[48]   *See, e.g.*, Oct. 29, 2020, Nonfinal Office Action, at TSDR 6-9, 26-39; Nov. 23, 2021, Final Office Action, at TSDR 13-45; March 9, 2023, Nonfinal Office Action, at TSDR 12-74, 77-112, 118-72, 180-240; Jan. 9, 2024, Subsequent Final Office Action, at TSDR 9-90, 98-128, 140-88, 191-200, 207-18, 225-28, 235-58. Though some of these third-party websites depict a few non-circular watch faces, they are far outweighed by the number of circular watch faces.

hindered by according the design trademark protection"); *In re Bose Corp.*, 772 F.2d 866, 872 (Fed. Cir. 1985) ("If the feature asserted to give a product distinctiveness is the best, or at least one, of a few superior designs for its de facto purpose, it follows that competition is hindered" and the feature is unprotectable).

*Honeywell* is instructive here. That case also concerned a circular-shaped component: a round thermostat with a circular-shaped transparent face through which the thermostat temperature indicator could be seen. The Court quoted extensively from the Board's analysis of the evidence of record, including the following key passage:

> What applicant is seeking to register is essentially a protective cover for a round thermostat device which is so arranged that the essential operating and temperature controlling and indicating mechanism[s] of the thermostat are visible to the operator. All of these characteristics are functional or utilitarian features of thermostat covers per se. The fact that both the cover and the thermostat are round does not detract from the functional characteristics thereof. In fact, it may add to the utilitarian aspects. There are only so many basic shapes in which a thermostat or its cover can be made ... namely, squares, rectangles, or "rounds" with the latter probably being the most utilitarian configuration of them all . . .. This is demonstrated by the widespread use over the years of round-shaped control devices for appliances and similar equipment. The fact that thermostat covers may be produced in other forms or shapes does not and cannot detract from the functional character of the configuration here involved. In sum, the overall configuration of applicant's thermostat cover, as presented for registration, is essentially functional in character and, as such, it does not possess the necessary attributes of a proprietary trademark necessary for registration.

532 F.2d at 182.

This holding maps on to the evidence concerning the circular watch face in the two applications before us. Articles explain that the round watch face is by far the most popular and common design, having the advantages of matching the circular sweep of the time-indicating hands of the watch and of versatility, in that it works well with other variable design elements in watches. The evidence of third-party watches confirms this, showing that while a few other shapes are sometimes used, far and away the most widely-used shape is circular. Where, as in these cases, the evidence overwhelmingly demonstrates widespread use of a design feature an applicant claims is a part of its trade dress, that feature is functional.[49] *See id.*

Because the designs in the applications "comprise[ ] matter"—i.e., a round watch face—"that, as a whole, is functional," *see* 15 U.S.C. § 1052(e)(5), they are subject to Trademark Rule 2.52(b)(4) and those functional elements must be depicted in dotted or broken lines. To this extent, the Examining Attorney's drawing requirement here is, as in *Water Gremlin*, "entirely in order." *See Water Gremlin*, 635 F.2d at 844.

---

[49]  Applicant here echoes the observation in *Honeywell* that other shapes (e.g., squares or rectangles) are sometimes used, *see, e.g.*, 13 TTABVUE 21 ('780 Application), but, as in *Honeywell*, that argument fails to grapple with the records in these cases, which reflect undeniably widespread use of circular watch faces. Applicant also included two hyperlinks in its appeal briefs and argued that the webpages to which they allegedly lead contain alternative designs, which Applicant argues is evidence of the nonfunctionality of unspecified features in the two watch designs here. *See, e.g., id.* at 26. The Examining Attorney objects, noting that the record should be complete before appeal. *See, e.g.*, 15 TTABVUE 3 ('780 Application). We agree with the Examining Attorney. *See* Trademark Rule 2.141(d) ("The record should be complete prior to the filing of an appeal."). We also note that, even had the links been provided in prosecution, that would have been insufficient to make the resulting pages of record. *See, e.g., In re Aquitaine Wine USA, LLC*, Ser. No. 86928469, 2018 WL 1620989, at *9 n.21 (TTAB 2018) ("we do not consider websites for which only links are provided") (citations omitted).

Applicant argues that the Examining Attorney improperly found that many of the other design features claimed as part of the proposed marks were functional due only to evidence showing that each of these components has a function.[50] Except as to the circular watch face, we think Applicant may have a point.

The Examining Attorney argues that use of these other components also is "common" in the watch industry. For each such other feature, the Examining Attorney recites the general function each feature performs[51] and cites several examples of third-party watches that have the feature in the same or a similar configuration as that depicted in the drawings.[52] Our review of the full record, however, indicates that the evidence as to these features differs from that as to the circular-shaped watch faces in two respects that we think are significant. First, we do not see articles indicating the prevalence and benefits of these features having the configuration depicted in the drawings, as we did with circular-shaped watch faces. Second, as to each of these other features, the Examining Attorney has pointed to far fewer examples of third-party watches with the element in question (or something similar) than the number of watches with circular watch faces in the record. In fact,

---

[50]  *See, e.g.*, 13 TTABVUE 21-24 ('780 Application).

[51]  *See, e.g.*, 15 TTABVUE 6 ("The watch case is also functional because it protects the inner workings of the watch") ('780 Application); *id.* at 7 ("The crown of the watch is functional because it sets the time and winds the watch, and the hexagonal shape allows for easier gripping"); *id.* at 8 ("The lugs, or attachment studs, are functional because they secure the watch case to the strap"); *id.* at 9 ("The linked bracelet is functional because it secures the watch on the user's wrist"). The Examining Attorney does not argue that a waffle-textured backing of the watch face (element [11]) is functional.

[52]  *See, e.g.*, 15 TTABVUE 6 (watch case with inward-tapered ends "highly common") ('780 Application); *id.* at 7 (hexagonal crowns "common"); *id.* at 8 (rectangular lugs in pairs "commonly appear"); *id.* at 9 (linked bracelet "highly common").

the record reveals that the vast majority of, third-party watches depict these other features in configurations other than the configuration these features have in the drawings here.

In short, as to these other features, the evidence fails to show that the particular shape or design in the applications before us works better because of their configuration. *E.g.*, *In re R.M. Smith, Inc.*, 734 F.2d 1482, 1484 (Fed. Cir. 1984) (that a design element performs a function does not mean that the element is legally functional unless the degree of utility is such that the public needs to be able to use that element to compete effectively); *see also In re Deister Concentrator Co.*, 289 F.2d 496, 502 (CCPA 1961) ("A feature dictated solely by 'functional' (utilitarian) considerations may not be protected as a trademark; but mere possession of a function (utility) is not sufficient reason to deny protection.").

In sum, the evidence demonstrates that the functionality-based drawing requirements are correct, at least insofar as the circular watch face element is concerned. Because Applicant refused to make any changes to its drawing, and because no re-opening to amend the drawings to change any solid lines to dotted lines is permitted under our rules at this point, *see* Trademark Rule 2.142(g), 37 C.F.R. 2.141(g) (permitting re-opening of an application after a decision on appeal only as to disclaimers under Section 6, 15 U.S.C. § 1056), we affirm the functionality-based drawing refusals on that basis.

### 3. The acquired distinctiveness-based drawing requirement

As explained earlier, the Examining Attorney determined that Applicant proved acquired distinctiveness only as to the octagonal-shaped bezel and the eight hexagonal screw heads. The other elements were found to be nondistinctive and incapable of indicating source, necessitating the drawing requirement that they appear in dotted lines. We begin our review of these refusals by laying out the guiding legal principles of acquired distinctiveness and how it may be proved with respect to product design.

"[A] mark has acquired distinctiveness … if it has developed secondary meaning, which occurs when, in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself." *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 211 (2000) (citation and internal quotation marks omitted). "The applicant … bears the burden of proving acquired distinctiveness." *In re La. Fish Fry Prods., Ltd.*, 797 F.3d 1332, 1335 (Fed. Cir. 2015) (citing *In re Steelbuilding.com*, 415 F.3d 1293, 1297 (Fed. Cir. 2005)); *In re Hollywood Brands, Inc.*, 214 F.2d 139, 140 (CCPA 1954) ("There is no doubt that Congress intended that the burden of proof [under section 2(f)] should rest upon the applicant for registration ….").

Evidence such as advertising expenditures and sales success, length and exclusivity of use, unsolicited media coverage, intentional copying, and consumer studies, may be considered. *E.g.*, *Converse, Inc. v. ITC*, 909 F.3d 1110, 1120 (Fed. Cir. 2018); *Louisiana Fish Fry*, 797 F.3d at 1336. The amount and character of the

evidence required depends on the facts of each case and particularly on the nature of the mark. *See Roux Lab'ys, Inc. v. Clairol Inc.*, 427 F.2d 823, 829 (CCPA 1970). This evidence must reflect the effectiveness of the claimant's efforts in transforming public perception. *See, e.g.*, *In re Owens-Corning Fiberglas Corp.*, 774 F.2d 1116, 1125 (Fed. Cir. 1985); *In re Palacio Del Rio, Inc.*, Ser. No. 88412764, 2023 WL 3751118, at *13 (TTAB 2023). The less distinctive a mark, the higher the evidentiary burden to show acquired distinctiveness. *See, e.g.*, *Steelbuilding.com*, 415 F.3d at 1300.

Product design features fall within the category of marks requiring a relatively stronger showing of acquired distinctiveness than some other kinds of non-inherently distinctive marks. The Supreme Court has noted that, while consumers are "predisposed" to regard certain types of words used on products and product packaging as an "indication of the producer," in contrast:

> consumer predisposition to equate [a product design] feature with the source does not exist. Consumers are aware of the reality that, almost invariably, even the most unusual of product designs … is intended not to identify the source, but to render the product itself more useful or more appealing.

*Wal-Mart*, 529 U.S. at 212-13.

Even where there is evidence of substantial sales and advertising, that may not suffice to prove that a product design has acquired distinctiveness where the evidence shows that other marks are featured with the mark at issue or where the growth in sales could be attributed to the product's popularity. *See, e.g.*, *In re Bongrain Int'l (Am.) Corp.*, 894 F.2d 1316, 1318 (Fed. Cir. 1990); *see also In re Soccer Sport Supply Co.*, 507 F.2d 1400, 1403 (CCPA 1975) (advertising displaying the design at issue

along with word marks lacked the "nexus" that would tie together use of the design and the public's perception of the design as an indicator of source); *In re Mogen David Wine Corp.*, 372 F.2d 539, 541-42 (CCPA 1967) (where consumers were not exposed to the design feature **alone** as an indicator of source, but rather in conjunction with the applicant's primary trademark, the reasonable inference to be drawn is that any alleged association of the bottle design with the applicant (Mogen David) "was predicated upon the impression imparted by the mark MOGEN DAVID and other descriptive material appearing thereon rather than by any distinctive characteristic of the container per se."). This problem is especially acute for alleged product design marks precisely because sales success is more likely attributable to consumers' accepting the product than to consumers perceiving any particular product feature as a source-indicator.

With these legal principles in mind, we turn to the evidence and arguments in these cases.

First, Applicant does not argue that its sales numbers support a finding of acquired distinctiveness.[53] Applicant does, however, argue that its advertising and

---

[53] Applicant included a table listing units sold and sales revenue for U.S. sales in its April 28, 2021, Response to the first Nonfinal Office Action. *See, e.g.*, Apr. 28, 2021, Response, at TSDR 26-26 ('780 Application). But Applicant does not mention anything about this in its briefs on appeal. Therefore, any argument based on sales numbers is forfeited. *See In re E5 LLC*, Ser. No. 77795412, 2012 WL 3224720, at *2 n.2 (TTAB 2012) (not considering argument made in prosecution but not maintained in appeal brief); *see also* TBMP § 1203.02(g) ("If an applicant, in its appeal brief, does not assert an argument made during prosecution, it may be deemed waived by the Board."). Even if Applicant had pursued this argument on appeal, we see other issues with this table. First, we could not find any declaration verifying these amounts. *See In re Nat'l Distillers & Chem. Corp.*, 297 F.2d 941, 944-45 (CCPA 1962) ("statements made over the signature of counsel are not evidence of the facts averred").

promotion of the designs support a finding of acquired distinctiveness.[54] We have reviewed the advertising exemplars and promotional materials Applicant provided. While the evidence is voluminous, there are several issues with it. First, we see no "look for" advertising. "'Look for' advertising refers to advertising that directs the potential consumer in no uncertain terms to look for a certain feature to know that it is from that source." *In re SnoWizard, Inc.*, Ser. No. 87134847, 2018 WL 6923620, at *6 (TTAB 2018) (citation omitted); *accord* 1 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 7:30 (5th ed. Sept. 2024 update) ("Look for" advertising "draws the shopper's attention to [the] particular feature" or features at issue); 2 MCCARTHY § 15:30.

In contrast, "advertising that simply includes a picture of the product or touts a feature in a non-source-identifying manner" does not qualify as "look for" advertising or reveal that any specific product feature has acquired distinctiveness. *SnoWizard*, 2018 WL 6923620, at *6 (citation omitted); *see also In re Jasmin Larian, LLC*, No. 87522459, 2022 WL 374410, at *16 (TTAB 2022) ("[I]n the context of product design marks, it is imperative that the evidence of acquired distinctiveness relate to the promotion and recognition of the specific configuration embodied in the applied-for mark and not to the goods in general.") (cleaned up; citations omitted). Professor

---

Second, they are said to reflect sales for the Royal Oak line, but, as we will discuss when reviewing Applicant's advertisements, the Royal Oak line includes many watch designs that have elements that vary from the elements depicted in the drawings in this case. As a consequence, these unverified figures appear to be significantly overinclusive.

[54] *See, e.g.*, 13 TTABVUE 14-15 (citing advertisement exemplars attached to Apr. 28, 2021 Response to Nonfinal Office Action; Declaration of Xavier Nolot, attached to Apr. 27, 2022, Request for Reconsideration).

McCarthy explains that "look for" advertising is especially important when the issue, as it is in these cases, is acquired distinctiveness of product design, because a "product feature like shape or color will not normally be perceived by buyers as an indicator of origin." 1 MCCARTHY § 7:30. The lack of "look for" advertising in these cases is significant.

Though Applicant does not argue that it has engaged in "look for" advertising, it does argue that its advertising has, for over 50 years, "promoted the Design Mark."[55] While Applicant has provided thousands of pages of advertising, we see a number of issues with it that substantially reduce its probative value in demonstrating that these two designs have acquired distinctiveness, i.e., that consumers rely on the precise combinations of multiple design elements in the two drawings to identify source.

First, while some ads depict the watch design in question, a majority of the ads depict watches that have some of the claimed elements but, as to others, depict different and/or additional elements. Below is an example of an ad depicting a watch containing the elements comprising the body of the watch that is common to the two designs (i.e., the non-watchband elements):

---

[55] *See, e.g.*, 13 TTABVUE 14 ('780 Application).



But many more ads in the record for the "Royal Oak" line depict watches that differ from the two designs because the body of the watches contain additional and/or different elements:



---

56    Apr. 28, 2021, Response to Nonfinal Office Action, at TSDR 152.

57    *See id.* at 146 (different watch face design (not the waffle design) plus additional projections on either side of the crown).







---

[58] *See id.* at 148 (different watch face design (not the waffle design) and additional knobs/buttons on either side of the crown).

[59] *See id.* at 156 (different watch face design).

[60] *See id.* at 159 (different watch face design with larger waffling plus additional projections on either side of the crown and color (which is disclaimed in the applications)).







---

[61] *See id.* at 172 (different watch face design).

[62] *See id.* at 217 (different watch face design with larger, limited area waffling, plus additional jewel-like inserts between the screwheads and additional projections on either side of the crown).

[63] *See id.* at 185 (different watch face design, with larger waffling, plus additional projections on either side of the crown).







---

[64] *See id.* at 196 ((different watch face design (not the waffle design), different studs, plus an additional crown-like elements on one side of the crown).

[65] *See id.* at 227 (different watch face design, with larger waffling, plus additional projections on either side of the crown).

[66] *See id.* at 259 (different watch face design, with limited-area waffling, plus additional jewel-like inserts between the screwheads and additional projections on either side of the crown).





[67] *See id.* at 267 (different watch face design plus additional projections and crown-like knobs/buttons on either side of the crown).

[68] *See id.* at 270 (different watch face design, with larger waffling, plus additional projections on either side of the crown and another crown-like knob/button on the case at the 10:00 position).







---

[69] *See id.* at 275 (different watch face design (not the waffle design)).

[70] *See id.* at 293 (different watch face design (not the waffle design) plus additional projections on either side of the crown).

[71] *See id.* at 298 (different watch face design (not the waffle design), different studs, plus additional projections on either side of the crown).







---

[72] *See id.* at 341 (different watch face design (not the waffle design), different studs, plus additional projections on either side of the crown).

[73] *See id.* at 343 (different watch face design (not the waffle design)).

[74] *See id.* at 406 (different watch face design (not the waffle design), screwheads not within bezels but in inward-pointing projections from the bezel, plus additional projections on either side of the crown).

Applicant's catalogs similarly show a wide array of "Royal Oak" designs, most of which do not feature all of the claimed elements of the watch body in these two applications.[75]

The common thread among the watches depicted in these ads appears to be the octagonal bezel and eight evenly-spaced screwheads within the bezel.[76] Indeed, Applicant's website has expressly touted that "[t]he octagonal bezel with its 8 hexagonal screws have become the collection's trademark."[77] Consistent with the Examining Attorney's exclusion of those two features from the drawing requirement, these ads have relatively more probative value in showing acquired distinctiveness in those two features together. But these ads, many of which depict different or more features than the combination of features in the applications, lose significant force as proof that any of the other seven of the nine features of the watch bodies, or the nine features together, indicate source. *See Jasmin Larian*, 2022 WL 374410, at *16

---

[75] *See, e.g.*, Apr. 28, 2021, Response (Pt. 3) to Nonfinal Office Action, at TSDR 735, 749, 763, 819-21; *see also id.* at TSDR 840.

[76] Even that is not entirely accurate. See watch depicted at April 28, 2021, Response at 406 (screwhead embedded in inward projections from the octagonal bezel). We further note that these ads depict the watches in color, yet the two applications disclaim color. Applicant's website suggests that color is part of what consumers recognize, stating that consumers know Applicant's watches by the "steel case" together with the "octagonal bezel, 'Tapisserie' dial and integrated bracelet," which Applicant says makes its Royal Oak-line watches "an icon." *Id.* at 277.

[77] *See* March 9, 2023, Nonfinal Office Action, at TSDR 278. Applicant's large color catalog repeatedly highlights the octagonal bezel, frequently with the hexagonal screw heads and "Tapisserie" watch face design, less frequently with other features. *See, e.g.*, Apr. 28, 2021, Response (Pt. 3) to Nonfinal Office Action, at TSDR 515, 525, 527, 592, 596, 610, 694, 718, 724, 728, 736 ("renowned octagonal bezel, with its eight white gold screws"), 742.

(emphasizing the importance in advertising of directing attention to the specific claimed configuration, as opposed to the product in general).

And, importantly, beyond the varying features themselves, most of the watches depicted in Applicant's ads also display one or more of Applicant's word marks (e.g., AUDEMARS PIGUET and/or AP) on the watch faces. And the textual aspects of the ads feature Applicant's word marks, including ROYAL OAK, as well. The presence in the ads of these word marks—which consumers are predisposed to view as source indicators, *see Wal-Mart*, 529 U.S. at 212-13—in ads that do not specifically call consumers' attention to the claimed design elements, detracts from the potential for Applicant's advertising to educate consumers to look to the design elements alone to identify source. *See, e.g.*, *In re McIlhenny Co.*, 278 F.2d 953, 956-57 (CCPA 1960) (where the evidence of how the bottle was presented to consumers showed that the bottles bore the applicant's registered word mark and its company name, court found that "this evidence does not convince us that the general public has accepted applicant's unlabeled bottles per se as identifying appellant's product so as to warrant registration of the bottle on the Principal Register … under section 2(f)"); *see also Soccer Sport Supply*, 507 F.2d at 1403 (advertising displaying a design along with word marks lacked the "nexus" that would tie together use of the design and the public's perception of the design as an indicator of source).[78]

---

[78] *See also Union Mfg. Co. v. ITC*, 826 F.2d 1071 (table), 1987 WL 37901, at *1 (Fed. Cir. July 2, 1987):

> To determine secondary meaning in this case, Union presented evidence of extensive advertising and sales for over 15 years. The Commission … determined that the evidence

We therefore believe that Applicant substantially overstates the degree to which its advertising supports its claim that the precise combination of elements in these two applications (or any of the elements other than the octagonal bezel and eight hexagonal screw heads) serve as source indicators to the watch-consuming public.[79]

Another type of evidence relevant to any acquired distinctiveness analysis is articles or other unsolicited media coverage highlighting the proposed mark. *See Converse*, 909 F.3d at 1120; *Louisiana Fish Fry*, 797 F.3d at 1336. Here, there is no shortage of articles in the record. Applicant, however, directs us to none that highlight the combination of elements in the two applications here. Nor could we find any in our review of the record. In fact, the only articles that we could identify as highlighting any design elements included in the two applications focused on the octagonal bezel with its hexagonal screw heads.[80] We find that these articles, while

---

did not support [that] the bottle shape and appearance have attained secondary meaning independent of the word mark (UNO-VAC) on the bottle. Union's evidence of sales and advertising … pertained for the most part to bottles having the UNO-VAC word mark on them—hence, such sales and advertising could not support an inference of secondary meaning with respect to the bottle shape in the absence of UNO-VAC. We see no error in the Commission's analysis. Union's evidence failed to show that its marketing created a commercial impression separate and apart from the word marks appearing thereon that serves, in and of itself, as an indication of origin.

(cleaned up) (citing, inter alia, *McIlhenny Co.*, 278 F.2d 953).

[79] There is no accompanying evidence that would give us an indication of how pervasive Applicant's advertising is and how it compares to others in the watch industry. Contextual evidence is important because it allows us to more accurately determine the probative value of an applicant's sales and advertising figures. *See, e.g.*, *Mini Melts, Inc. v. Reckitt Benckiser LLC*, Opp. No. 91173963, 2016 WL 3915987, at *19 (TTAB 2016); *In re Gibson Guitar Corp.*, Ser. No. 75513342, 2001 WL 1631369, at *3, *4 (TTAB 2001).

[80] *See, e.g.*, Apr. 28, 2021, Response (Pt. 2) to Nonfinal Office Action, at TSDR 81, 176 (also mentioning the blue color of the watch face); 199, 202, 208, 282, 311, 332, 369, 395, 436, 449, 478, 494, 504.

they may enhance Applicant's brands generally and show association of the octagonal bezel with eight hexagonal screw heads with Applicant, do not show that the combination of elements in the applications before us have acquired distinctiveness.[81]

Consumer affidavits attesting to recognition of the trade dress at issue as an indicator of source are also relevant. *See, e.g.*, *Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 969 (Fed. Cir. 2015). Applicant points to no such evidence, nor could we find any in the record.

Similarly, consumer studies, also known as surveys, may bear on acquired distinctiveness. *See Converse*, 909 F.3d at 1120; *Louisiana Fish Fry*, 797 F.3d at 1336. Here, Applicant points to a survey submitted as evidence in the previously-mentioned infringement litigation.[82] The survey discloses that it "was conducted to determine whether there is evidence of likelihood of confusion between the [defendant's accused watches] and the design of the Audemars Royal Oak watch design (sic)."[83] In other words, as the Examining Attorney points out, this was an infringement survey, not an acquired distinctiveness survey.[84] That's not an automatic disqualifier in an

---

[81] There is no evidence that the articles in the record were "unsolicited." That does not necessarily make the them irrelevant, because even if Applicant solicited them as part of its promotional efforts, they still are available for public viewing and thus can have an effect on public perception. But it reduces their probative value, because unsolicited articles reflect the views of a third-party observer as to things as they are, whereas a solicited article may just as well reflect the view of the client. *Cf. Owens-Corning Fiberglas*, 774 F.2d at 1125 (evidence of use of the mark should be supplemented with evidence of the effectiveness of such use in molding public perception); *Roux Lab'ys*, 427 F.2d at 828-29 (that a mark is adopted and used with the intent that it indicate source "does not necessarily mean that [it] accomplishes that purpose in reality") (citation omitted).

[82] *See* 13 TTABVUE 9.

[83] Apr. 28, 2021, Response (pt. 1) to Nonfinal Office Action, at TSDR 82.

[84] *See* 15 TTABVUE 17-18.

acquired distinctiveness case if the product the respondents are shown "contain[s] the same features as the claimed trademark." *See Textron, Inc. v. ITC*, 753 F.2d 1019, 1024 (Fed. Cir. 1985).

But here we see at least three problems with the survey from the prior litigation. First, as the Examining Attorney points out, the watches that the respondents were shown are not "look-alikes" with the two designs here: "While the watches have an octagonal bezel adorned with screw heads and a tapered watch case, they do not have a waffled watch face, rectangular lugs, a hexagonal crown, or a linked bracelet."[85] And, indeed, the survey report explains that the vast majority of the respondents confused by the defendant's watches pointed to the octagonal shape, sometimes in combination with the screws, which were hexagonal, as the reason why they thought the source of the defendant's watches was Applicant. But the features that confused these respondents—the octagonal bezel and hexagonal screw heads—are excluded from the drawing requirements here, and none of the respondents mentioned any of the other elements of the designs here.[86]

Second, it is well settled that, in disputes concerning registration (as opposed to infringement cases), the survey must use the drawing, not a photo of the product. *See, e.g.*, *Kohler Co. v. Honda Giken Kogyo K.K.*, Opp. No. 91200146, 2017 WL 6547628, at *46 (TTAB 2017); *accord TBL Licensing, LLC v. Vidal*, 644 F. Supp. 3d 190, 202

---

[85]   *See id.* at 18; *see also* Apr. 28, 2021, Response (pt. 1) to Nonfinal Office Action, at TSDR 126, 128 (showing the photos of the defendant's watches that were shown to survey participants).

[86]   *See* Apr. 28, 2021, Response (pt. 1) to Nonfinal Office Action, at TSDR 82.

(E.D. Va. 2022), *aff'd*, 98 F.4th 500 (4th Cir. 2024). After all, the drawing reflects the mark sought to be registered. *See* 37 C.F.R. § 2.52.

Third, the survey report is dated 2013,[87] and, from the footers and headers appearing on the tabulated survey results themselves, appears to have been conducted in 2012.[88] *See, e.g., Royal Crown Co. v. Coca-Cola Co.*, 892 F.3d 1358, 1371 (Fed. Cir. 2018) (noting that "a survey is only probative if it deals with conditions at the appropriate time" and questioning whether any weight should have been given to a 5-year old acquired distinctiveness survey) (citation omitted); *Morton-Norwich*, 671 F.2d at 1344 (questioning probative value of a 4-year old survey). Here, results of a survey conducted over a decade ago are a highly suspect basis on which to determine consumer perception now, especially when the evidence shows that, in the intervening years, Applicant has been offering many watch models that, while they have an octagonal bezel and eight hexagonal screw heads, also feature many components that deviate from the remaining elements depicted in the two drawings before us. *See generally In re Chippendales USA Inc.*, 622 F.3d 1346, 1354 (Fed. Cir. 2010) ("[T]he right to register must be determined on the basis of the factual situation as of the time when registration is being sought.") (citations omitted).

For these reasons, we find the 2013 survey decidedly unhelpful.

Length and exclusivity of use are also relevant to whether a claimed feature or features have acquired distinctiveness. *See, e.g., Converse*, 909 F.3d at 1120;

---

[87]  *See* Apr. 28, 2021, Response (pt. 1) to Nonfinal Office Action, at TSDR 81.

[88]  *See id.* at 93-124, 133-42.

*Louisiana Fish Fry*, 797 F.3d at 1336. A purported trademark must both "identif[y] and distinguish[ ]," *Qualitex*, 514 U.S. at 163-64; *see also USPTO v. Booking. com BV*, 140 S. Ct. 2298, 2302 (2020) ("A trademark distinguishes one producer's goods or services from another's."); *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 198 (1985) (trademarks allow consumers "to distinguish among competing producers"), so use by others is an impediment to proving acquired distinctiveness. "When the record shows that purchasers are confronted with more than one (let alone numerous) independent users of a term or device, an application for registration under Section 2(f) cannot be successful, for distinctiveness on which purchasers may rely is lacking under such circumstances." *Levi Strauss & Co. v. Genesco, Inc.*, 742 F.2d 1401, 1403 (Fed. Cir. 1984); *see also Galperti, Inc. v. Galperti S.r.L.*, 17 F.4th 1144, 1148 (Fed. Cir. 2021); *Ayoub, Inc. v. ACS Ayoub Carpet Serv.*, Opp. No. 91211014, 2016 WL 4474509, at *13 (TTAB 2016).

Here, the Examining Attorney argues that distinctiveness is lacking as to several design elements in the two drawings (excepting the octagonal bezel and the eight hexagonal screw heads) because the elements in question are "highly common in the watch industry."[89] As we detailed above, the evidence does indeed show that round-shaped watch faces are ubiquitous among watch producers.[90] The record also shows many producers also use waffle-textured materials very similar to Applicant's on the

---

[89]  *See* 15 TTABVUE 12; *see also id.* at 12-16.

[90]  *See supra*, p. 22 & fn. 48.

backing of the watch face. Just a few representative examples from the record appear below:



Kenneth Cole
$125.00
91

92

93

94

95

96

---

91  *See* March 9, 2023, Nonfinal Office Action, at TSDR 13.

92  *See id.* at 23.

93  *See id.* at 157.

94  *See id.* at 29.

95  *See id.* at 49.

96  *See id.* at 72; *see also, e.g., id.* at 17, 18, 33, 37, 78-89, 93, 100, 112; Jan. 9, 2024, Subsequent Final Office Action, at TSDR 14, 15, 17, 19, 23, 27, 35-39, 43-45, 54, 79; *see also*

Applicant thus lacks the substantial exclusivity needed to claim that consumers have come to view these features as uniquely indicating Applicant as the source.[97]

We therefore are not persuaded by Applicant's evidence that the combined design features constituting the two product design configurations at issue have acquired distinctiveness.[98]

Applicant also advances a different kind of attack on the acquired distinctiveness-based drawing requirement. It argues that this requirement impermissibly singles out certain elements of the watch designs. Applicant insists that its designs are "unitary" and therefore "cannot be separated into registrable and non-registrable parts."[99] Applicant explains that a "unitary mark creates a single and distinct commercial impression which means it is an inseparable whole and has no

_id._ at 31-33 (Reddit question-and-answer forum where consumers are inquiring what "entry level" watches sport the waffle-textured face pattern and, in response, shown exemplars of such third-party watches). The common use by other watch manufacturers of a waffle-back pattern contrasts with the evidence showing Applicant's substantially exclusive use of the octagonal bezel together with the eight hexagonal screw heads and articles acknowledging that those two elements are associated with Applicant.

[97] We do not ignore the evidence of Applicant's long use, which, when exclusive (or substantially so), is relevant to whether a claimed feature or features have acquired distinctiveness. However, because substantial exclusivity is lacking here, as discussed above, the length of Applicant's nonexclusive use is immaterial.

[98] Intentional copying may also be evidence of acquired distinctiveness, _see, e.g._, _Converse_, 909 F.3d at 1120; _Louisiana Fish Fry_, 797 F.3d at 1336, but Applicant's appeal briefs do not argue that there have been instances of intentional copying of the trade dress reflected in the two drawings here. Therefore, any such argument is forfeited. _See E5 LLC_, 2012 WL 3224720, at *2 n.2; TBMP § 1203.02(g).

[99] _See_ 13 TTABVUE 15-16 ('780 Application); 13 TTABVUE 15-16 ('814 Application).

unregistrable components."[100] It says that the combinations of elements in the two applications are viewed by average consumers as such.[101]

In support, Applicant points to the declaration of Mr. Nolot, its Director of Supply Chain Operations. He testified that "high-end watch purchasers … view the design as a unique unitary combination of parts and as such do not seek to fragment the design into its constituent elements."[102] We are unpersuaded.

First, we note that the goods identified in the two applications are not limited to expensive or "high end" watches. Registrability is determined based on the goods as they are identified in an application. *See, e.g.*, *Real Foods Pty Ltd. v. Frito-Lay N. Am., Inc.*, 906 F.3d 965, 981 (Fed. Cir. 2018); *In re Dimarzio, Inc.*, Ser. No. 87213400, 2021 WL 5822579, at *9 (TTAB 2021). Therefore the relevant consumers of watches include people seeking high-end watches, low-end watches, and watches in the middle range. The declaration does not speak to anything other than high-end watch consumers.

Second, we see no consumer evidence corroborating Mr. Nolot's opinion, *see, e.g.*, *Ayoub, Inc. v. ACS Ayoub Carpet Serv.*, Opp. No. 9121101, 2016 WL 4474509, at *11 (TTAB 2016) (discounting testimony of applicant's principal that consumers recognize the proposed mark because of the lack of corroborating consumer evidence), and we note that he is an officer of Applicant, which has a commercial interest in

---

[100] *See* 13 TTABVUE 11 ('780 Application) (cleaned up); 13 TTABVUE 11 ('814 Application).

[101] *See id.*

[102] *See* Declaration of Xavier Nolot, attached to Apr. 27, 2022, Request for Reconsideration, at TSDR 11-12.

obtaining these registrations, *see, e.g., In re David Crystal, Inc.*, 296 F.2d 771, 773-74 (CCPA 1961) (giving little weight to an affidavit of the applicant's president because he is an interested party).

Third and most significantly, Applicant's actions before the USPTO belie the contention that the designs before us are unitary. We note that the '814 Application is the same as the design in the '780 Application except that Applicant itself separated out the bracelet portions (bracketed numbers [8], [9], & [10] in the descriptions, *supra*) of the design in the '814 Application. And as to the watch body that is common to the both designs, the Examining Attorney correctly notes that Applicant owns two recently-renewed[103] registrations for designs that include only the elements represented by bracketed numbers [1], [2], & [3] in the descriptions of these two applications, separating out the other elements and thereby negating the assertion that the two designs before us are unitary:



| | |
|---|---|
|  | Reg. No. 2866069 (renewed Oct. 11, 2024)[104] |

---

[103] We take judicial notice of the recent renewals reflected in the USPTO's electronic records. *See, e.g., Harry Winston, Inc. v. Bruce Winston Gem Corp.*, Opp. No. 91153147, 2014 WL 3686875, at *4 n.19 (TTAB 2014).

[104] *See* March 9, 2023, Nonfinal Office Action, at TSDR 365-66.

|  | Reg. No. 3480826 (renewed Nov. 3, 2022)[105] |

*See also In re Slokevage*, 441 F.3d 957, 963 (Fed. Cir. 2006) (trade dress by its nature contains a combination of distinct elements and therefore generally is not considered unitary).

Applicant challenges whether there is authority for imposing a drawing requirement to dot-out parts of the design based on the failure to prove acquired distinctiveness of the entire design.[106] First, the previously-discussed *Water Gremlin* case provides such authority. It held that where a mark contains registrable and unregistrable features, a drawing requirement would be "entirely in order" as to an "unregistrable feature of the claimed mark." 635 F.2d at 844. While Applicant is correct that the drawing requirement there was based on a functionality determination that showed that a feature of the mark was unregistrable, we do not see anything in the decision that indicates that it would not apply to a finding that a feature was incapable of functioning as a trademark due to lack of distinctiveness and for that reason unregistrable.

The USPTO may register only marks that satisfy the statutory criteria, not marks that partially do and partially don't satisfy them. And one criterion for registration

---

[105]  *See id.* at 367-68.

[106]  *See* 13 TTABVUE 13-16.

on the Principal Register is that the proposed mark is distinctive. Drawing requirements plainly advance that obligation by providing a means to exclude unregistrable matter from a mark or design that combines matter that is registrable with matter that is not.

Applicant's argument seems to be that, where an Examining Attorney determines that an applicant's evidence establishes acquired distinctiveness only as to part of the design but not as to the whole design, the whole design must be registered because no drawing requirement may be imposed on the part of the design not perceived as a source identifier. That would make no sense because the registered mark would include separable and unregistrable components, contrary to precedent. *See In re Richardson Ink Co.*, 511 F.2d 559, 561 (CCPA 1975) ("Although appellant's mark RICO SOLID STATE as a whole is not 'merely descriptive,' and hence registrable, appellant is not entitled to register the same unless descriptive and unregistrable subject matter contained therein is disclaimed."), *cited in Water Gremlin*, 635 F.2d at 844 ("An application which includes a claim to rights in unregistrable subject matter must be rejected.").

The Examining Attorney's distinctiveness-based drawing requirement reflects the unusual nature of Applicant's proof of distinctiveness in these cases. Applicant's evidence does not show that consumers recognize the combinations of elements here as source indicators, but does show that they so recognize the octagonal bezel with the eight hexagonal screw heads. Two things necessarily follow from that: the designs before us cannot be registered; and a design claiming solely those non-functional,

proven source-identifying components qualifies for registration. The drawing requirements here reflected that unusual situation and therefore were "entirely in order." *See Water Gremlin*, 635 F.2d at 844-45.

**Decision**: The refusals to register are affirmed as to both applications.